J-S20016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BRADLEY RZEPECKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIE RZEPECKI, NOW, | : | |
| HETHERINGTON | : | |
| | : | No. 147 WDA 2022 |
| Appellant | : | |

Appeal from the Order Entered January 3, 2022
In the Court of Common Pleas of Erie County
Civil Division at No. 10228-2015

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

MEMORANDUM BY MURRAY, J.:                 **FILED:  June 24, 2022**

Julie Rzepecki, now, Hetherington (Mother) appeals from the order granting the request of Bradley Rzepecki (Father), for modification of custody of the parties' two children, B.R. (born October 2010)  and P.R. (born March 2013) (the Children).  After careful consideration, we affirm.

The parties were married in 2009 and divorced in 2015.  At the time of their divorce, the parties agreed to share legal and physical custody of the Children.  *See* Marital Settlement Agreement, 4/20/15.

Four years later, Mother petitioned to modify custody.  Mother alleged Father "had addiction issues and recently relapsed."  Petition for Modification of Custody, 4/20/19, at 2.  Mother requested the court "grant primary residential custody of the children to [M]other, with periods of supervised visitation" with Father.  *Id.*  The parties subsequently entered into interim

consent orders before executing an order which provided, *inter alia*, that the Children "reside with [M]other, except that [F]ather shall have visitation" every other weekend, supervised by Children's paternal grandparents.[1] Order, 8/7/19, at 1.

On March 22, 2021, Father filed a motion to modify the August 7, 2019 order, averring "it is in the best interest of the [C]hildren that the Custody Order be modified to provide for equal physical custody." Motion for Modification of Custody Consent Order, 3/22/21. On April 19, 2021, Mother filed preliminary objections challenging the court's jurisdiction.[2] Father filed a response in opposition. The trial court heard argument and thereafter entered an order finding the court had jurisdiction and denying Mother's preliminary objections. Order, 7/6/21. Mother did not appeal.

The case was scheduled for trial in September 2021, but the parties cancelled after reaching a tentative agreement. They were unable to reach a final agreement, however, and the case proceeded to trial in December 2021. The court explained:

> [I]t is Father's position that, although he is to blame for the past few years' disruption in his custodial relationship with the children,

_____

[1] By the time Father remarried in July 2020, "the custody supervision requirements were lifted by mutual agreement." Trial Court Opinion, 1/3/22, at 2.

[2] In 2017, Father consented to Mother relocating with the Children to Clymer, New York. Although Mother continued to submit to Pennsylvania's jurisdiction through 2019, she claimed New York was the Children's home state, and Pennsylvania no longer had "exclusive, continuing jurisdiction[.]" Preliminary Objections, 4/19/21, at 3.

he is now rehabilitated and it is in the children's best interests to return to a more balanced custody arrangement where both parents share equal importance in their children's lives.

Mother is remarried and lives on a farm in Clymer, New York. She testified that she's been primarily responsible for raising the children for most of their lives. Father's drug and alcohol problems plagued their marriage and were a primary cause of its dissolution.

She admitted to unilaterally moving the children to homeschooling.

Trial Court Opinion, 1/3/22, at 4.

On January 3, 2022, the court issued an order and accompanying opinion addressing the enumerated custody factors set forth in the Child Custody Act at 23 Pa.C.S.A. § 5328(a). According to Mother, the court granted Father "additional time with the [C]hildren and for the [C]hildren to attend public school instead of homeschooling." Mother's Brief at 7. Mother filed a timely request for reconsideration. The trial court denied the request and Mother timely appealed. Both Mother and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.[3]

Mother presents the following issues for review:

I.    Whether the Trial Court committed an error of law and/or abused its discretion in finding [Father's] testimony was credible considering the testimony and evidence presented at Trial?

_____

[3] The trial court "observe[d] that the Concise Statement is not particularly concise." Trial Court Opinion, 3/9/22, at 2. The court also stated, "to the extent [Mother] raises an issue on appeal that is not addressed in this 1925(a) Opinion, the same should be deemed waived for failure to identify the same in the Concise Statement." *Id.*

II.     Whether the Trial Court committed an error of law and/or abused its discretion in finding that the best interest of the [C]hildren would be served by granting [Father] additional custody time considering the testimony and evidence presented at trial?

III.    Whether the Trial Court committed an error of law and/or abused its discretion in disregarding the testimony of [Mother] and [C]hildren's wishes to remain in home school and finding it to be in [C]hildren's best interest to matriculate in Clymer Public School in the middle of the school year?

IV.    Whether the Trial Court committed an error of law and/or abused its discretion in disregarding the testimony and evidence presented at trial and modified the current Order for the best interest of the [C]hildren by removing the necessity of [F]ather to engage in random drug and alcohol testing?

Mother's Brief at 4-5.

In reviewing Mother's issues, we recognize

the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. ... However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination[.] ... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

Moreover,

on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> The test is whether the evidence of record supports the trial court's conclusions.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citations omitted).

In addition, it "is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, [giving] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion[.]" *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted). The "knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006).

In all four issues, Mother argues the trial court erred because its decisions (finding Father credible, granting Father additional time with Children, requiring Children to attend public school, and declining to impose random drug and alcohol testing upon Father), "have not been substantiated by the evidence and testimony presented at trial." Mother's Brief at 11. We disagree.

When deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the

relevant Section 5328(a) factors. *See E.D. v. M.P.,* 33 A.3d 73, 80 (Pa. Super. 2011). It is well-settled that "the best interest of the child is paramount." *See B.S.G. v. D.M.C.*, 255 A.3d 528, 536 (Pa. Super. 2021) (citation omitted). "The courts of this Commonwealth have consistently held that the ultimate consideration in custody matters is to determine that which is in the best interests of the child and that such determinations must be made on a case-by-case basis." *Myers v. DiDomenico*, 657 A.2d 956, 957 (Pa. Super. 1995).

Instantly, four individuals testified at trial: Mother, Father, and the two Children. The Children were 11 and 8 years old at the time, and testified "in chambers with counsel present." *See* Trial Court Opinion, 1/3/22, at 2. In the opinion accompanying its order, the trial court summarized the testimony of Mother, Father and the Children, concluding that "based on the testimony and other evidence presented at trial, Father's Petition will be granted in part." *Id.* at 6. The court summarized the "facts adduced at trial . . . in conjunction with the relevant custody factors set forth at 23 Pa.C.S.A. § 5328(a), keeping in mind that the [c]ourt's paramount concern in child custody cases is the best interests and safety of the children." *Id.* (citation omitted).

In its Rule 1925(a) opinion, the trial court expanded upon the reasoning set forth in its opinion accompanying the modification order. *See* Trial Court Opinion, 3/9/22. The Honorable Joseph M. Walsh, III, sitting as the trial court, cited the record and statutory custody factors supporting the order. *Id.* After

careful consideration, we discern no abuse of discretion. The record supports President Judge Walsh's comprehensive best interest analysis pursuant to Sections 5328 (factors to consider when awarding custody) and 5338 (modification of existing order). As President Judge Walsh has authored a thorough and well-reasoned opinion addressing Mother's issues, we adopt the March 9, 2022 opinion as our own and affirm the custody order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/24/2022

BRADLEY RZEPECKI,         :   IN THE COURT OF COMMON PLEAS

        Plaintiff      :   OF ERIE COUNTY, PENNSYLVANIA

     vs.           :   FAMILY DIVISION – CUSTODY

                        :

JULIE RZEPECKI, now,       :
HETHERINGTON,

        Defendant    :   NO. 10228-2015

## 1925(a) OPINION

**Date: March 9, 2022**

### I. PROCEDURAL POSTURE

An adversarial hearing (also referred to as "custody trial") was held on December 21,

2021 on Plaintiff-father, Bradley Rzepecki's ("Appellee") petition for custody modification.

Both parties were present and represented by counsel. The children, B.R. (age 11) and P.R. (age

8), were not present in open court, but testified in chambers with counsel present.

Thereafter, the trial court entered its custody order and opinion summarizing its

consideration of the custody factors set forth at 23 Pa.C.S.A. §5328(a) ("Explanatory Opinion")

on January 3, 2022. Defendant-mother, Julie Rzepecki, now Julie Hetherington ("Appellant")

filed a motion for reconsideration on January 12, 2022, which was denied. Appellant filed her

timely Notice of Appeal and Concise Statement of Errors Pursuant to Pa.R.A.P. 1925(b)

("Concise Statement") on February 1, 2022.

### II. ERRORS COMPLAINED OF ON APPEAL

Section B of Appellant's 26 paragraph Concise Statement sets for the following errors

complained of on appeal:

25.    The [ ] Court committed an abuse of discretion and/or error of law when it concluded that the Appell[ee]'s testimony at trial was credible regarding his substance abuse, that additional time with the Appellee was in the children's best interest and that changing the children from the home school setting they had

1

*A-1*

enjoyed to Clymer public school during a pandemic, was in their best interest. The Court based its decision on Title 23 Pa. C.S.A. §5328(a) and Appellant is asserting that errors are specifically in regards to 5328(a)(3)(4)(7)(10)(12), and (14). Appellant is asserting an abuse of discretion and/or error of law to the provisions of the child custody statute outlined above in the Order and Opinion issued by the Court.

26. The issue as to 23 Pa. C.S.A. §5328(a), it is asserted that the Court did not consider the impact of changing the children's school during the school year and how this would impact their health and social environment. The Court did not consider that the increase in time with the Appellee would be detrimental to the children's lifestyle and daily activities. The Court did not consider the children's well-reasoned preference although they were described as bright, well-mannered children.

(*Concise Statement*, ¶ 25). Preliminarily, the trial court observes that the Concise Statement is not particularly concise. Nevertheless, in the interest of facilitating appellate review, and because the trial court's Explanatory Opinion was prepared without the benefit of the transcribed record, the court will expand on the findings and conclusions most important to its decision. However, to the extent Appellant raises an issue on appeal that is not addressed in this 1925(a) Opinion, the same should be deemed waived for failure to identify the same in the Concise Statement.

## III. CUSTODY FACTORS ANALYSIS UNDER THE CHILD CUSTODY ACT, 23 PA.C.S.A. §5328(a)

### A. §5328(a)(l) Party more likely to encourage and permit frequent and continuing contact between child and another party[1]

There were two areas of inquiry particularly relevant here. One involved Appellee's admitted substance abuse history, the other the children's custodial preferences. Both were used

---

[1] Appellant's Concise Statement may aver error in connection with only some of the custody factors, specifically 5328(a)(3), (4), (7), (10), (12) and (14). However, review of only some factors would produce an incomplete review of the case as a whole. All of the factors were integral to the court's final decision, so all are addressed herein, at least briefly, for appellate review.

2

*A-2*

by Appellant to oppose Appellee's efforts to have more frequent custodial time with the children, so both are relevant here. [2]

### 1. Appellee's substance abuse history

Appellee admitted engaging in substance abuse on least two occasions in the past; once involving prescription drugs "over ten years ago," and once more recently in or about 2019 involving alcohol. (Tr. 20-21, 23, 46-47). The 2019 episode was the catalyst for the parties' current custody dispute in two respects. First, it was the reason Appellee voluntarily relinquished equal shared custody after having enjoyed the same since the parties separated in 2015. (Tr. 13, 20-21). Second, Appellant continues to hold the episode against Appellee by insisting he continues to abuse drugs and/or alcohol. (Tr. 9, 77).[3]

All of the parties' custody orders during the relevant time period were entered by mutual consent and all required the parties to refrain from using illegal drugs or alcohol "in the presence of the children." (Exs. 2, 3, and 4). They also required some form of periodic drug and alcohol testing for Appellee. (Id.).[4] The order Appellee sought to modify in these proceedings, dated August 6, 2019, required "hair follicle testing" every six months. (Ex. 4, ¶ 2(i)). There was no testimony as to why the parties agreed to hair follicle testing. To the court's knowledge, the

---

[2] The court's specific findings against Appellee under the custody factors are not covered in depth in this 1925(a) Opinion, as Appellee did not file a cross-appeal.

[3] There was no professional testimony describing Appellee's substance abuse condition. The term "substance abuse" as used herein is not intended to infer any particular clinical diagnosis in connection with Appellee's substance use or abuse.

[4] Because the orders' drug and alcohol use and testing provisions came about by mutual agreement, the trial court did not infer they were necessarily indicative of the severity of Appellee's condition. It is not uncommon for parents to agree to drug and alcohol restrictions and testing requirements in order to reassure the other parent, whether they deem it strictly necessary or not.

3

*A-3*

results could have no bearing on the particulars of when or where a prohibited substance was used; a positive hair follicle test would not prove Appellee violated the custody order by using around the children.

This was problematic at trial (and on appeal) because much of Appellant's case revolved around supposed admissions Appellee made to using alcohol in 2020, but then recanted at trial. She believes Appellee lied at trial and the trial court overlooked it. (Concise Statement, ¶¶6-10, 25). Appellant's evidence consisted of two documents signed by Appellee, one in January of 2020 and one in May of 2020 (Exs. C and D). Both were prepared by Appellant and contained attestations by Appellee that had taken a drug/alcohol test at the time of signing, he would have failed. Yet at trial he insisted he has been sober for at least two years. (Tr. 48).

Appellee explained at trial that he signed the documents to avoid the expense of drug testing. In his words, Appellant "strong-armed" him, and he signed them to "get her off my back" because she "would threaten to never let me see the kids again." (Tr. 50-51).

Though the court did find Appellee's explanation truthful, if not wise, the issue of the 2020 "admissions" was largely a distraction from the actual issue before the court - whether Appellee ever put the children at risk of harm or neglect due to substance abuse. The answer to this issue was clearly "no."[5]

Appellant offered no evidence, not even her own testimony, that the children were ever put at risk of harm or neglect due to Appellee's alleged substance use. In fact, when Appellant testified at length about the episode involving prescription drugs several years ago, which occurred when they were still married, she said she had no clue he was he was taking them.

---

[5] The same applies to parties' dispute over a hair follicle test allegedly showing alcohol use in February of 2021. Appellee contested the test methodology, and the results were never offered into evidence. (Tr. 25-26). However, again, regardless of the test results, Appellant offered no evidence to connect the alleged alcohol consumption to any risk of harm to, or neglect of, the children.

*A-4*

(Tr.75). And, despite her testimony that Appellee's substance abuse "spiraled" through the dissolution of their marriage, she admitted agreeing to equal shared custody as part of their marital settlement, with no restrictions on drug or alcohol use. (Tr. 76, Ex. 1). She also admitted that since 2019 she has not been sufficiently concerned about Appellee's alleged substance use to seek relief from the court or additional protections for the children. (Tr. 11). When pressed by the court for details about her knowledge of Appellee's ongoing substance use, she changed the subject (Tr. 77). Further, her claim that Appellee is still using and hiding it is inexplicably at odds with his experience in 2019, when all appear to agree he voluntarily disclosed his alcohol problem and asked Appellant to take primary custody.

Finally, there were no other indicia of chronic substance. Appellee has no criminal record, no DUI's; there is no history of job loss. In fact, his employer appeared at trial to affirm what a hardworking and reliable employee Appellee is. (Tr. 71).

Over the course of the one day trial, it became increasingly apparent to the court that Appellant was using Appellee's past history of substance abuse to legitimize her refusal to encourage frequent and continuing contact between the children and Appellee, which factored against her as discussed below in connection with the decision to increase Appellee's custodial time and return the children to public school.

### 2. Appellant's Reliance on the Children's Preferences

Appellant's testimony at trial revealed that she tends to ally with the children against the Appellee, using the children's alleged preferences as an excuse to undermine Appellee's parental role.

For example, regarding an episode where Appellant refused to allow the children to go on a camping trip with the paternal grandparents, after having previously agreed they could go,

5

A-5

Appellant admitted her reversal came after Appellee filed his modification petition, but added that the children did not want to go anyway:

> A.   Yes.  She did reach out to me.  But, again, it was right before the previous court arrangement.  And I did say that I think that it would be best if she had seen the kids on Brad's time.
>      And not only for that, but because the kids had a play date already arranged.  They had a lot of things they that were going to be doing.  And I asked them if they wanted to go camping, and they wanted to go with their friends.

(Tr. 91).  Other examples include:

> Q.   [ ] I get the sense that you object to [Appellant] spending more time with his children; is that correct?

> A.   I wouldn't say that I object to him having any more time with the children.  I would say that, umm, if the children felt a little bit more comfortable in the home that they have with their father, then I would be more inclined to let the children -- I shouldn't say let the children -- I wouldn't feel the way that I do.  (Tr. 9).

> Q.   ...Where would you like to see [B.R.] play soccer?

> A.   He wanted to go out to the Olympic soccer in Buffalo.  (Tr. 86).


> Q.   ... [D]oes Erie offer a similar program?

> A.   ... I did tell [Appellee] that [B.R.] needed to have time to discuss it and think about it ... (Tr. 86-87).

> Q.   Have you had any issues with Appellee enrolling the child in any extra-curricular activities without your knowledge or your consent?

> A.   Yes. ... [B.R.] came home and asked me to say something to his father.  So, I did... (Tr. 88).

> Q.   Okay.  Do you guys agree that [the AWANA club] is a good program?  Or do you -- does dad have some reservations about that program?

> A.   I don't know, because I never -- I'm going to be honest -- I never asked dad.  Because it was on the times that I had the kids, and the kids wanted to go really bad ...(Tr. 89)

> Q.   What would be the issue if dad were to have more time in the summer with the children?  What would be your complaint about that?

> A.   I think the only issue would be is that the kids wouldn't be able to see their friends.  And they feel like they can't see their friends now because this trial basis -- he always had something planned for the weekends that they had them.  (Tr. 89-90).

6

A-6

Q.    The 2019 Order that's in effect right now, …[w]hy is that in the children's best interest at this time?

A.    Because it's what the children want… (Tr. 94).

In its entirety, Appellant's testimony lacked the balance one would expect from a parent truly concerned about encouraging a relationship with the other parent. Never once did Appellant relate an episode where the children were appreciative of Appellee, or enjoyed being with him. Her complaint on behalf of the children that he "always had something planned" on his weekends was out of place – why would he not have plans? It revealed that she, as much or more than the children, viewed Appellee's custodial time as an inconvenience or impediment to the children's true happiness. She gave no examples of the children actually missing an important activity because Appellee was inflexible in his plans.

### 3.    Weight Ascribed to Custody Factor 5328(a)(1)

The trial court concluded that Appellant was not encouraging contact between children and Appellee, and not fostering a positive view of Appellee in the children, and that her failures, whether intentional or not, were undermining Appellee's relationship with the children. This played an important role in formulating the provisions of the custody order presently on appeal.

### B.    §5328(a)(2) and (2.1)  Present and past abuse committed by a party or member of the party's household / Consideration of child abuse and involvement with protective services

There was no evidence of abuse committed by either party or a member of their household. This factor was considered to the extent that, whatever the nature of Appellee's past substance abuse, it did not manifest in abusive behavior toward Appellant or the children.

### C.    §5328(a)(3)  Parental duties performed by each party

There is nothing to add to the Explanatory Opinion under this factor. Appellant's complaints about specific behaviors of Appellee, including ignoring alleged food allergies and objecting to homeschooling, are considered under more applicable factors below.

7

*A-7*

**D.** **§5328(a)(4) Need for stability and continuity in the child's education, family life and community life**

Two primary issues were considered under this factor: The choice of homeschool versus public school, and whether transitioning to equal physical custody, especially during the school-year, would be in the children's best interests, and not unduly disruptive to their established routines.

**1.** **Homeschool vs. Public School**

Appellee testified that when the parties were together, they lived in the Iroquois School District in Erie County, Pennsylvania. (Tr. 29). The children remained in the Iroquois School District when the parties separated in 2015, and Appellant moved to the Clymer, New York area. (Tr. 30). When Appellee lapsed into alcohol abuse in 2019 and Appellant took primary custody, Appellee agreed to move the children to the Clymer public school system. (Id.). They attended there for a year, until Covid-19 hit in early 2020 and the parties agreed Appellant would homeschool for the balance of the year. (Id). Thereafter, Appellant elected to continue homeschooling into the 2021-2022 school-year without conferring with Appellee. Appellee credibly testified: "When COVID started, they did a lot of remote learning. And her and I agreed for that one year that they could be homeschooled. When it came time to start school this year, she would not have any conversation; would not acknowledge a request to discuss it. And just kept saying, it's for lawyers to decide. And continued to homeschool them." (Id.).

Appellant did not deny Appellee's account of events. She agreed the children were doing well in Clymer public school prior to the pandemic (Tr. 35, 78), but she asserted they were better off in homeschooling and they liked it better. (Tr. 78-80). She testified that the children were so distraught over "Appellee wanting them to be in a public school" that she took them to a

8

A-8

therapist. (Tr. 85).[6] She averred that both children were bullied in public school, and P.R. has dyslexia and difficulties related to short attention span. (Tr. 79-80).

The court questioned Appellant and the children carefully about their bullying allegations and determined they were exaggerating the incidents to dissuade the court from returning the children to public school. (Tr. 96-100, 113-115). They described repeated incidents of assaultive behavior occurring in the presence of other parents and teachers inexplicably with no repercussions to the offenders or mention of injury to the alleged victims. (Id.). The testimony simply did not ring true.

Regarding P.R.'s special needs (dyslexia and "ADHD" (Tr. 78)), Appellant appears to have arrived at those diagnoses on her own (no clinical opinions were produced), and selected homeschool curriculum deemed by her to adequately accommodate P.R.'s special needs Justifiably or not (it is impossible to tell on the scant record), Appellant used P.R.'s dyslexia as the reason she unilaterally abandoned curriculum carefully selected with Appellee's agreement (Abeka), in favor of one chosen exclusively by her which necessitates weekly visits to a tutor who tells Appellant how or what to teach P.R. (Tr. 78-79).

Appellee objected to homeschooling for all of the reasons one would expect. Appellant is not accountable for their progress; she is not a trained teacher; if P.R. has special needs, Appellant is not equipped to provide educational support; and Appellant is able to manipulate the homeschool environment so the children prefer it regardless of whether they are learning at an appropriate pace. (Tr. 30-31, 53-54).

---

[6] Appellant's testimony that she enrolled the children in therapy because they were having difficulty communicating with Appellee about homeschooling and other nonspecific issues was misleading. The children testified that they have been in therapy off and on for years, most recently for the past three years. (Tr. 123-124).

9

*A-9*

In the end, neither party provided a compelling case for or against homeschooling from the perspective of whether it would provide the children with an education significantly better or worse than public school. Instead, it was the unilateral nature of Appellant's decision that persuaded the trial court to return the children to public school. By refusing to acknowledge Appellee's dissention in advance, and by acting as though the decision was hers alone to make, Appellant blatantly set the stage for an "us against him" dispute over schooling. She made herself the children's champion and positioned Appellee as the one solely responsible for threatening their happiness. This is the same undermining and manipulative behavior the court observed multiple times under factor 5328(a)(1) and the court is of the firm opinion that it is not in the children's best interests to see it succeed, even if the decision would cause some temporary disappointment.

## 2. Equal Shared Custody During the School Year.

The court did not grant Appellee's petition for equal shared custody during the school year largely because it granted his request to return to the children to public school. Recognizing the school change could necessitate time for adjustment, the court did not find it in the children's best interests to add to the potential stress by simultaneously changing their living arrangements.

Nevertheless, Appellant argues that it was error for the court to adopt the custody schedule agreed to by the parties in the fall of 2021,[7] which changed Appellee's every other weekend from Friday to Sunday, to every three out of four weekends from Friday to Monday. Appellant essentially gave three reasons for her objection to the new schedule, (1) Appellee ignores purported food allergies, so the children come home sick, (2) the new schedule infringes

---

[7] The parties convened for a trial, or perhaps a settlement conference, before the Honorable John J. Trucilla in September of 2021 and reached a tentative agreement. However, it appears the settlement fell through. (See 10/18/21 Order). Regardless, the parties have been following the agreed upon custody schedule ever since.

10

A-10

on time the children would otherwise have to play with their friends, and (3) the children do not want to spend more time with Appellee.

### a. Food Allergies

Appellant testified:

Q. Has your child, [P.R.], been diagnosed with any food allergies, to your knowledge?

A. She hasn't been diagnosed with any. But she does come home and say that, at her dad's house, she doesn't have any gluten-free options, or lactose-free options.

And when she'll eat -- she's too afraid to tell him this. But when she does eat, she throws it up in her mouth and then swallows it. And she comes home with rashes all the time. (Tr. 91-92).

...

Q. The 2019 Order that's in effect right now, is that the Order you want to maintain?

A. Yes.

Q. Okay. Why is that in the children's best interest at this time?

A. ... When they started this Order, and it was Friday to Monday. Every Monday, they would come home and they would be sick. And we were grateful that they would give them breakfast in the morning. But they would come home, and they'd be so sick that they'd throw it up every Monday.

So, they stopped eating. Well, at least I know [B.R.] did, because [B.R.] told me, umm, that he stopped eating it.

And then [P.R.] will comes home, and she has hives all over her mouth. And she doesn't feel good. And she told me the last time that she came home that she had French toast. So, this time I -- I didn't ask her. So --(Tr. 94).

The trial court did not find Appellant's assertions regarding food allergies credible for several reasons. The most obvious reason was that she provided no explanation for why the children didn't have the same problems under the prior custody schedule, when presumably they ate in Appellee's home on Fridays, Saturdays and Sundays, further it appears she to no protective action. Her failure to act in the face of alleged sickness so severe the children were throwing up, getting hives, and refusing to eat on a regular basis, lent credibility to Appellee's testimony that he feeds the children food they like with no adverse consequences. (Tr. 57). Importantly, the

11

A-11

children, who were not shy in criticizing life in Appellee's home, made no mention of any issue pertaining to food.

### b. Time with Friends

Appellant's concern over disruption of the children's social networks was given little weight, primarily because it was not fact based. Appellant retained primary custody during the school-year. She is free to arrange play dates with their homeschool friends during the week and on her weekends. She can take them to their AWANA club meetings and other activities during the week. Further, there appears to be nothing preventing the children from inviting their friends to Appellee's house on weekends, or during the week in summers, for play dates (a constructive idea that should naturally occur to a parent looking to solve problems, rather than create them). In sum, the benefit the children will gain from spending more time with Appellee far outweighs the minor disruption in their social life.

### c. The Children's Preferences

Appellant's reliance on the children's preferences under this custody factor is wrong for all of the reasons discussed under the previous factors. In addition, Appellant's capacity to state at trial and in her Concise Statement that the children do not want to spend more time with their father, therefore, they should not have to, is deeply troubling under the facts of this case. There is no indication Appellant is concerned with remedying the alleged estrangement. She has the children in therapy to talk about the problems she blames on Appellee, but admits he was never encouraged, or even invited, to participate. (Tr. 85-86). She expressed no regret over the strained relationship, nor does it appear she has any intention to work to resolve it. Under the facts of this case, it is imperative to the best interests of the children that the court intervene

12

A-17

where Appellant will not, to assure that Appellee has sufficient time with the children to strengthen and maintain his parental bond with them.

E. **§5328(a)(5) and (a)(6)  Availability of extended family and children's sibling relationships**

The facts adduced at trial did not require in depth consideration under this factor. There was no indication the court's award of custody would have any significant impact on the children's relationships with extended family or each other.

G. **§5328(a)(7)  Well-reasoned preference of child, based on child's maturity and judgment**

Considering the parental dynamics in this case, in particular Appellant's strong tendency to align herself with the children in opposition to Appellee, the court was not surprised to hear the children's stated preferences to live primarily with Appellant and remain in homeschooling. Thus, the court's questioning focused on whether there were reasons for those preferences beyond mere assimilation of Appellant's influence.

1. **Preference to Remain in Appellant's Primary Custody.**

The children's testimony about Appellee was delivered like a punch list of complaints, rather than an expression of physical or emotional neglect, or fear of Appellee. They did not appear troubled by Appellee's actions, merely eager to give reasons for the outcome they desired. Their testimony was considered in its entirety, but the following are some examples of their complaints:

| THE COURT: | … [W]hat did your mom tell you about today? What was going to happen? |
| B.R.: | She just said we're going to go to court. |
| THE COURT: | Did you say, what for? Why do I have to go? |
| B.R.: | Umm, she said it's for custody. |
| P.R.: | And we don't really want to be with our dad as much. |

13

A-13

| | |
|---|---|
| THE COURT: | You do not want to be with your dad as much? |
| P.R.: | Huh-uh. |
| B.R.: | He plays video games all day most of the time. |
| P.R.: | Yeah. He doesn't really spend time with us. |
| B.R.: | And then he gets mad at the video games. |
| P.R.: | And he swears. So, we usually play with the cats, or we play with our dog. |
| B.R.: | Or go in the basement and play soccer. (Tr. 119-120). |

...

| | |
|---|---|
| THE COURT: | ... Does [your Dad] talk to you at all about custody stuff? |
| B.R.: | No. |
| THE COURT: | Mom? Just mom does? |
| B.R.: | Umm, yeah. But he does, like, kind of bully us sometimes about the custody thing. |
| P.R.: | And we had to go to therapy. |
| B.R.: | Yeah. He kind of bullies us. Like, he always -- he'll bully us and say, like, are you ready to spend more time here now? |
| | And if we don't answer, then he'll start yelling at us. |
| P.R.: | And then you can keep on coming up with -- |
| B.R.: | Yeah. And he'll get mad at us if we don't answer. (Tr. 121-122) |

...

| | |
|---|---|
| THE COURT: | ... Now, you're talking to the counselor. What -- what is that all about? |
| B.R.: | My therapist? |
| THE COURT: | Your therapist. I'm sorry. |
| B.R. | To talk about what I need to talk to her about. |
| P.R.: | Mm-hmm. |
| B.R.: | About, like, whatever happened at my dad's, or whatever is going on at my mom's, or whatever is just happening. (Tr. 123). |

The children offered no spontaneous favorable testimony about Appellee, his wife, the paternal grandparents, or their paternal cousins. In response to leading questions, they begrudgingly admitted it could be fun at Appellee's house (Tr. 117), that their step-mother is

14

A-14

nice (Tr. 113), and they had fun with their cousins and grandparents (Tr. 117-118), but they countered with negative commentary - Appellee's wife sleeps too much (Tr. 113), their cousins are mean (Tr. 118). B.R.'s testimony about Appellee's bullying was highly reminiscent of Appellant's. (Tr. 10, "I would like to see him not bully them so much.").

In sum, their attitude toward Appellee was similar to Appellant's in that they expressed no remorse or desire to improve the situation. In the court's experience, children who truly experience lack attention from a parent will express sadness and desire for things to be different. B.R. and P.R. did not seem sad, just determined to convince the court of what they wanted.

Accordingly, their testimony was not deemed to be well-reasoned or based on mature judgment. In conjunction with its findings and conclusions under factors 5328(a)(1) and (a)(4), the court again reached the conclusion under this factor that it would be detrimental to the children's relationship with their Appellee, and, therefore, go against their best interests, to give weight to their stated preference.

### 2. Homeschooling

The children testified to their preference for homeschooling in no uncertain terms. However, as previously discussed, the court's concern in this area was not primarily whether the children preferred homeschooling or not, but rather the continuing harm to the father-child relationship if the court were to condone Appellant's tactics. Nothing in the children's testimony led the court to conclude that the preference for homeschooling should override this concern. In fact to the contrary, the court was satisfied that both children would adjust to returning to public school without undue difficulty. When asked open-endedly how they would feel if they went back to public school, B.R. said he would not "like it as much" as homeschooling, but he did not appear distraught about the prospect. (Tr. 114). He went on to mirror Appellant's testimony

15

about bullying, but he was no more convincing than she was. He too described rampant, unchecked assaultive behavior, where mostly all public school students were perpetrators and "even the bullies get bullied" while the teachers look on in silence. (Id.). B.R. delivered this testimony with no sign of fear or anger. Again, the testimony, especially considering the unemotional way in which it was presented, simply did not ring true.

### H.     Factors §5328(a)(8) through (15)

There is nothing to add to the trial court's consideration of the remaining factors that is not documented in its Explanatory Opinion. As set forth in the Explanatory Opinion, the court's conclusions under factors 5328(a)(8), (a)(9), and (a)(10) essentially turned on the same issues identified under factors 5328(a)(1) through (a)(7) involving the long term effects of Appellee's loss of equal shared custody due to alcohol abuse and Appellant's failure or refusal to support his return to equal co-parent status. The parties raised no issues related to childcare and proximity of residences. Despite their differences, their level of conflict was relatively low as evidenced by the number of consent agreements they were able to reach, and their civility toward each other at custody exchanges (Tr. 38-39), and during the course of the instant litigation. The evidence of substance abuse pertained only to Appellee and was covered exhaustively in connection with the preceding factors. Accordingly, the court will not rehash the evidence adduced at trial under the remaining factors.

## IV.  CONCLUSION

The testimony and other evidence produced at trial was carefully considered in conjunction with the relevant custody factors set forth at 23 Pa.C.S.A. §5328(a), and in light of the court's paramount concern for the best interests and safety of the children. The court's decision to continue the parties' current physical custody schedule and expand to equal shared

16

A-16

custody in the summers recognizes the importance of Appellant's more prominent role in the children's lives, while at the same time giving Appellee sufficient time to grow and enhance his parental bond. The decision to return the children to public school immediately was carefully considered and found necessary to offset the ill-effects of Appellant's unilateral decision – making and unhealthy pattern of allying with the children against Appellee. For all of these reasons, the custody order of January 3, 2021 should be affirmed.

BY THE COURT:

_____
Joseph M. Walsh, III, Judge

cc:    Custody Conciliation
        Greg Grasinger, Esq. (for Defendant-Appellant)
        Joseph Martone, Esq. (for Plaintiff-Appellee)

A-17